Our last case this morning is number 20-11509 Mary Bradley v. Officer Casey Benton. Mr. Bryan, we'll start with you. You may have pleased the court. My name is Bennett Bryan and I'm proud to represent Officer Casey Benton of the DeKalb County Police Department in this appeal. We're here today because the district court below improperly denied qualified immunity to Officer Bradley for a fourth amendment claim arising out of a traffic stop, a foot chase, and a subsequent use of a taser that unfortunately resulted in the tragic death of Mr. Troy Robinson. This court should reverse the district court's judgment for three reasons. First, in denying qualified immunity for the traffic stop, the district court applied the wrong standard in determining the lawfulness of that stop and ignored undisputed testimony of five police officers that established the reasonableness of Officer Benton's conduct in conducting that stop. Second, the district court then hung the rest of its opinion, hung its hat on the rest of or the rest of its opinion on the alleged unlawfulness of the stop and sort of determined that Benton's subsequent actions were tainted as if they were fruits of poisonous tree, which is inconsistent with 11th Circuit precedent. And finally, the district court defined the clearly established right prong of the qualified immunity analysis at a very abstract high level of generality and relied on non-binding cases from other jurisdictions, which the U.S. Supreme Court has repeatedly instructed lower courts not to do because defining the clearly established law at a very high level of generality makes it difficult to understand whether qualified immunity should apply in any given factual context. Mr. Bryan, can I ask you to talk a little bit about the third aspect of the claim, which is the use of the taser? In your brief, you seem to take it as a given that Officer Benton used a taser when Mr. Robinson was standing on the ground, and it was then that Mr. Robinson tried to scale the fence and fell. But there are at least two other potential narratives at summary judgment, one being the narrative given by the other police officer who said he was on the scene and witnessed what happened, and the other one is piecing together the statements of eyewitnesses about where they saw Mr. Robinson, when they heard the pop, when they saw him tense up, and when they saw him go over, combined with the cartridge, for lack of a better word, of the taser on the other side of the given the summary judgment record. Your Honor, first, I would say that the only testimony about when Officer Benton actually shot the taser to Mr. Robinson is Officer Benton's testimony about that happening before he started climbing the fence. The other officer said it didn't happen that way. He supported, I guess, in theory, Officer Benton's view that he shot him while he was on the ground, but the narrative is completely different about the sequence of events. The commonality is that he was shot before the taser was deployed before Mr. Robinson started climbing the fence, Your Honor. I know, and Officer Benton says the other officer wasn't there, and the other officer says he was there. I mean, they're diametrically opposed in a lot of ways. But not in the important way in that the taser was deployed when Mr. Robinson was still on the ground. Well, but there was, I mean, weren't there eyewitnesses that said they saw him sitting on top of the wall, and then, you know, he was tased and he fell off the wall? I respectfully know, Your Honor. The testimony, the primary witness testified at first, well, first of all, her testimony is conflicting. She first testified that she heard a pop and then saw Mr. Robinson fall off the wall, but then at her deposition, she admitted that she had an inconsistent statement saying that she didn't actually see any of that. So, but in any event, she did not, even if you were to take her testimony, she did not say that she saw Mr. Officer Benton shoot the taser at Mr. Robinson while he was on top of the wall. But in any event, even under the most, you know, the most generous view of the facts to the plaintiff, there is no clearly established precedent in the 11th Circuit in the U.S. Supreme Court or from the Georgia Supreme Court saying that a single use of the taser can constitute deadly force, because really the primary question is whether or not Officer Benton used reasonable force. But hold on, hold on. We've said a number of times that the use of a taser is not deadly force, right? So I agree with you up to there, but that doesn't mean that the use of a taser can never be deadly force. So for example, if you have someone who is swimming in a pool and you shoot that person with a taser, you've got to expect that that person is going to lose bodily control for at least a period of time and have trouble staying upright or floating in the pool, right? So context, like in a lot of other places, matters. So how does using a taser for someone who is, again, if you take the facts and the light most favorable to the plaintiff, if you use a taser against someone who's at the top of an eight-foot wall, how is that not tantamount to something approaching deadly force? Well, Your Honor, I think you're correct in saying the context is important. And so the way that we would resolve this is we would at least look to a case that has the factual context that is closest to ours. And that would be the Harper case that both parties rely on in their briefs, which in the Harper 2 case is the closest analogous factual scenario. In that case, there was someone that was up in an elevated position. He was not complying with police demands. He had fled. He potentially had a weapon on him. And that is the closest factual scenario here. And in the absence of any clearly established law that deals with these particular factual situations, because as Your Honor mentioned, context is important, qualified immunity applies. And that's both for the excessive force claim, which part of the district court's judgment on the excessive force claim sort of stems from the district court believing that the entire sequence of events was tainted from the very beginning. What relevance does the policy have that said that, in effect, when you make it impossible for them to protect themselves, for example, when they're at the top of an eight-foot wall? Isn't there a policy that is relevant to that and indicates that the officer should have known that it was extremely dangerous to shoot the taser when the victim was on the top of an eight-foot wall? Again, Your Honor, I think the context is important. A policy cannot create clearly established law under the Fourth Amendment. And while it might provide guidance, it cannot overcome qualified immunity. And again, the context here is important. The policy is in the abstract, and it doesn't consider all of the other factual scenarios that we were discussing. And so, as I mentioned, Your Honor, not to belabor the point, but the closest factual case that we have is Harper. And Harper, this court granted qualified immunity under similar facts. And again, I think it is important to discuss how the initial traffic stop was not unlawful, and the district court's case is problematic, because the issue for whether the traffic stop or the proper standard to determine whether the traffic stop was appropriate is whether a reasonable officer in Officer Benton's position could have believed that the placement and appearance of the expiration date on the tag violated or provided reasonable suspicion to initiate a traffic stop. And we have five officers testify to the same thing, saying that by looking at that tag, which is the tag that Officer Benton was looking at, they agreed that there was reasonable suspicion to initiate a traffic stop. Let me ask you to address this. I tend to agree with you, and that's why I'm going to cut you off, that the constitutionality in and of itself of the dispose of the issue. But though, isn't it relevant to the reasonableness of the officer's use of force that the only thing at issue here was a potentially misidentified dealer tag, and not something more significant? Isn't that at least relevant to the reasonableness of use of force? Well, again, whether any particular action is reasonable under the Fourth Amendment is a totality of the circumstances analysis. And so, I'm not suggesting that the court cannot consider what the initial stop was about. I'm not saying that the court can't consider it. I'm not saying that the district court couldn't consider it. But if we read it. I mean, I guess my point is even if that was right, even if there was a crime committed with that dealer tag, it wasn't this person who committed the crime, right? It was the driver who committed the crime. So, the only thing relevant for this person, at least the way I'm kind of looking at it, the only thing relevant for this person is that when he was asked his name, he tore off running across a busy intersection, across a parking lot, jumped a fence, and climbed a wall, which seems awfully suspicious to me. But that seems to be the thing that we should care about with respect to this person because the dealer tag thing doesn't even matter for this person at all, right? Yeah, I agree, Your Honor, which is one of the reasons why the district court's opinion relies so heavily on the alleged lawfulness of the traffic stop is problematic. If we read the district court's opinion denying qualified immunity as to the subsequent seizure, it says that the court says the connection between the seizure that occurred after Robinson's flight and his initial seizure during the traffic stop is not attenuated. The determination of whether the traffic stop was unlawful having been left to a reasonable jury, the court cannot decide this issue at summary judgment. And I agree with you, Your Honor, that we need to look at the circumstances surrounding Mr. Robinson's flight and not circumstances surrounding the initial traffic stop. Those two are attenuated. But unfortunately, because the district court more or less tied all of those things together, once the first issue falls, the others can fall along with it, both because the standard that the district court used is wrong and also for independent reasons based on Illinois versus Wardlow. And again, I really would like to emphasize the fact that the district court applied a very, very, very generous general definition of, I see my time is up, but a very generous general definition of clearly established law, which the Supreme Court said, you got to stop doing that. So thank you, Your Honor. I will reserve time for rebuttal. Mr. Bryan, one thing before you finish, I don't want you to address it now, but if you could look at it during Mr. Moore's argument and be prepared to address it on your rebuttal, you said, I think you said that in Harper, we granted qualified immunity, but it's the opposite result. We denied qualified immunity in Harper. And we use the obvious clarity standard of the fourth amendment to say that despite the existence of any similar cases, the officers use of a taser against somebody who was standing in a tree violated the fourth amendment. So I'd like you to take a look at that and then let me know what you think, because I'm not sure the case stands for the proposition that you think it does, at least in terms of your argument. I'm happy to address that, Your Honor. Judge Jordan, may I comment on that? Because I think, but I'm not sure, that you are confusing Harper v. Perkins with Harper v. Davis. And Harper v. Perkins said something like what you just said that was on appeal from the motion to dismiss. And then that case went down and had summary judgment, and it came back on Harper v. Davis then. And at that point, we did in fact grant qualified immunity, I'm pretty sure. Right. No, I agree. But that's because the facts developed that summary judgment when the case went back down were different than they were when the complaint was filed and you only went on the allegations. Correct. Okay. We're on the same page now. Yep. Yep. No, no, I agree. So if you're Brian, when it came back up the second time, then I would like to know when you get back up in rebuttal how the facts of that second case are similar to ours here. Thank you. Mr. Moore. Yes, Your Honors. May it please the court. I'll begin with the Harper case, since that seems to be on the court's mind. And I believe the Taser incident is really the heart of the case. The jury could find that Officer Benton violated clearly established law by using deadly force to prevent the escape of a person who was at most just a misdemeanor subject. And that's at most. Officer Benton's testimony was that he really didn't have a probable cause to suspect Mr. Robinson of any crime, particularly if you disregard as the jury could disregard Officer Benton's testimony that he thought he smelled marijuana at the scene of the traffic stop. The law doesn't need to be defined at such a fine-grained level as to specify the details of the use of force, as long as it's deadly force. And as long as the facts established that use of deadly force clearly is improper under the circumstances. And the Harper case addresses that by, as Judge Jordan pointed out, the first Harper case by applying the obvious standard. Now, the facts are different between the motion to dismiss incarnation of that case and the summary judgment version, because different facts became developed in discovery than the ones that had been alleged in the complaint of that case. In the complaint, the allegation was that the man was hiding in a tree, but that he was not armed and didn't pose any threat to the officers. And those allegations had to be taken as true at the misdemeanor stage. Um, at the summary judgment stage, it turned out that he had beaten his wife, fired a rifle in his home, uh, was drunk and on methadone and had carried the rifle with him into the woods in the dark and was hiding in a tree with the rifle. And before the officers tasered him out of the tree, uh, the, the, uh, I guess he didn't die. So he's not a decedent, but the, the individual in that case, uh, was observed to have the rifle. And one of the officers yelled, he's got a rifle. And then they tasered him. So the summary judgment case is extremely different from the circumstances here, or certainly different from what the jury could find the circumstances to have been here. Um, as Judge Anderson, I do think, I do think that, uh, that clearly are differences between Harper v. Davis and this case, uh, the, uh, crimes, uh, uh, of Harper, uh, are serious beating wife and, and, and so forth here. Uh, although you, uh, you don't have any particular crime, I do think there is reasonable suspicion based on the fact that as soon as, uh, the officer said he was going to run the name of, uh, our, uh, plaintiff, uh, he took off fleeing. And, uh, with respect to, uh, the similarity of danger, uh, Benton did testify that he thought that, uh, plaintiff could be a danger because he, uh, could have a weapon. There was a weapon found in the console. And then one of the officers, uh, shouted to, I think over the radio to Benton, uh, as, as he was foot chasing that, uh, a plaintiff was running, uh, with one hand swinging and the other hand, uh, at his waist, which, uh, a reasonable officer could believe, uh, he had a weapon and, and Benton so testified, uh, that, uh, he thought he could be a danger to the neighborhood into which he was going over the wall, uh, uh, because he could possibly have a weapon, uh, and the crucial assistance for Benton from Harper v. Davis, I think, uh, I'm not, I'm not at all sure it's seemed to me that Harper v. Davis establishes that a reasonable officer, uh, would not necessarily know that shooting a taser at someone on a limb eight feet above, uh, and therefore likely fall and, and, and, uh, seriously injured himself. I think Harper v. Davis does, uh, help Benton to the extent that it indicates that, uh, uh, a reasonable officer would not know of that danger of tasing someone who's on the top of a eight foot wall. Well, respectfully, Judge Anderson, I think, um, if you take both of the Harper decisions together, uh, I think the first Harper decision, uh, by applying the obvious clarity standard does show that a reasonable officer would know that, that immobilizing and depriving someone of the control of his muscles when he's at an elevated height could cause that person to fall and suffer the greatest bodily harm of death. And DeKalb County's own use of force policy, which Officer Benton testified he was aware of, uh, says that, and so do the taser training materials that are in the record in the deposition of DeKalb's 30B6 witness. Uh, so I think there, the jury could find that Officer Benton in fact knew when he used the taser that tasering someone down from that height, uh, was improper. And he admitted that in his deposition, Officer Benton did, that if, if Robinson had been at the top of an eight foot wall, it would have been improper to use the taser on him. Uh, his, his contention in his deposition was merely that he didn't do that. Uh, but that would be a question for the jury on the record. Could you address that? I was on top of the wall. Um, Mr. Brian just argued that there's not enough evidence in the record for us to say that that is conceivably what happened. What do you say about that? Well, there are a few things to say about that. Uh, one is that, uh, the court's probably familiar with the maximum, the maximum, uh, falsus in uno, uh, falsus in omnibus and Officer Benton, uh, his testimony is not credible throughout the course of events from the reasons for the traffic stop, his inconsistent testimony regarding whether or not he saw, uh, the, uh, or his, his incredible testimony as to whether or not he saw the expiration date on the tag. Uh, when he admits that he saw the registration number and ran it in his computer and the registration number and the expiration date actually overlap on the tag, as the district court pointed out, uh, jury could find that he, he just lied about that. And if they found that he willfully lied about that, they could reject the rest of his testimony. The inconsistency that Judge Jordan pointed out, uh, between Officer Benton and Officer Neiman's testimony casts doubt on the credibility of the both. So why did Neiman say exactly what was his name? Neiman gave an entire narrative about the course of events behind the family dollar and Benton's testimony was that Neiman was never there at all. Uh, now I don't know which way the jury would resolve that inconsistency, but that would be up to the jury. Um, Officer Benton also testified that his taser didn't work. My recollection, my recollection, Mr. Ward, and maybe this answers Judge Brasher's question is that Officer Neiman's testified that Mr. Robinson tried to go up the wall, was unable to do so, came down off the wall, and it was then that Officer Benton discharged the taser. That's right. And then Mr. Robinson tried to go up the wall the second time. And succeeded and then fell over on his own accord. Correct. And Officer Benton said that Officer Neiman's was never there. And that the first and falling never happened. Right. Correct. Right. So there's part, as Mr. Bryan said, there's part of their narratives that coalesce, but there's also a good chunk of it that is completely, completely different. That's right. Uh, now the jury also could find that that Benton's taser worked properly. It worked properly the day before when he used it on another subject. It worked properly the day of the incident when the GBI tested it. And the only evidence that it didn't work properly in that one instance when it was used on Robinson is Officer Benton's testimony, which the jury could reject because it's inconsistent with all of the other evidence on that topic. The jury also could reject Officer Benton's testimony that he used the taser when Officer Benton, when Robinson was on the ground as opposed to on top of the wall. So the evidence there, just for a brief review. In fact, all the evidence. They could reject, I guess. I guess I'm trying to say, what, what, what, where's the evidence? Just even the scintilla of evidence that the taser was fired when he was on top of the wall. Okay. So here, here's that evidence. And it's, it's more than a scintilla. It's everything except the testimony of Benton and Neiman. So the testimony of eyewitnesses from the apartment complex, and that's Nefertiti Geter and the Shaw brothers. And I, forgive me, I don't know if they're still minors, so I don't want to say their first names in a public place, but, but the testimony of the Shaw brothers was that Robinson was on top of the wall, called for help, and then his body locked up and he fell. That's consistent with the effect of a taser. Nefertiti Geter testified, as I think Mr. Bennett mentioned, that she heard a pop, which is the sound a taser makes when it's discharged, after she saw Robinson on top of the wall. The jury could credit that and I think Judge Jordan mentioned this, was found on the opposite side of the wall a few days later by Officer White, who then logged that green blast door as evidence in this case. So his conclusion apparently was that this green blast door was Officer Benton's green blast door. Officer Benton had no explanation for how that blast door could have ended up on the other side of the wall. But an explanation the jury could accept is if the taser was pointed up a man at the top of the wall instead of down towards a man on the ground. If it was pointed down, there's no way it would have cleared the wall. I thought, and you can tell me whether this is a correct recollection or not, I thought there was also testimony from one of the witnesses that they saw Mr. Robinson tense up and clench when he was on the wall. That's correct. That's correct. And I believe that was one of the Shaw brothers who testified that Mr. Robinson was on top of the wall, said something like help me, and then that his body seized up and he fell. And that's consistent with the effect of a taser, what they call neuromuscular incapacitation or NMI. I think you answered my question on that, certainly to my satisfaction. Let me ask you to address another issue that I have in the case, which is, to me, qualified immunity is a doctrine that's designed to protect police officers when they're making spur-of-the-moment decisions. It prevents judicial second-guessing of what they've done. To me, when you've got a guy running down the street, jumping over fences, whatever, and the cop has to decide what to do, this is a paradigmatic case for qualified immunity. What do you say about that? Well, Your Honor, I think Officer Benton had... If what Officer Benton really did here was pretextually pull over a car, knowing that he didn't have a reason to do so, and then when a man ran, chase him down the street and use deadly force to stop his escape, I think Officer Benton had plenty of opportunity, and any officer would have plenty of opportunity, to know that those things are not permissive. You're not supposed to pull people over for no reason. Arguably, he could chase a man who runs away from him, I think, on a reasonable suspicion basis, but that doesn't give him probable cause that would justify anything more than a Terry stop, and I don't think anyone could think that it's a Terry stop to shoot a man down off the top of an eight-foot wall and kill him, or potentially kill him, from the standpoint of Officer Benton doing it before he pulled the trigger. DeKalb County's own policies say that he wasn't supposed to do that, and his training to get his taser certification... Let me pose the question. I'll try to do it a little bit better this time. What worries me is the Harper v. Davis case. I realize it's unpublished, but we have law that says that if judges think that, then reasonable officers could think that. Therefore, it seems to me that Harper v. Davis stands for the proposition that reasonable officers would not know that shooting somebody with a taser on a precarious place, like a limb eight feet up, or a wall eight feet up, would result in serious bodily injury. Judge Anderson, Officer Benton, in this case, admitted that he did know that. Let me ask you this. Is that dispositive, or is it what a reasonable officer would think? Well, it's what a reasonable officer would think, but it also depends on the facts that are known to the officer at the time. I mean, the Fourth Amendment, generally, it's applicable. The reasonableness of an officer's action depends on what he knows, and he knew that that could kill Mr. Robinson. So if he did it, I think that's unreasonable, objectively. An officer knowing that to do it is acting unreasonably. Secondly, the Harper v. Davis case, I'm sorry, I don't recollect the specific order of the names, but that's what we're calling Harper 2. I believe it's the summary judgment. Harper v. Davis case turns on very different facts. The officers there quite a lot about the men they were chasing at the time. I do realize there's significant differences, but what they knew about Harper did not warrant execution, which, according to your position with respect to shooting a taser at someone on a precarious position eight feet up, is like execution. Clearly, in granting qualified immunity, the court held that reasonable judges would not necessarily know that. Reasonable officers would not necessarily know that. Well, I think the material fact, factual difference between Harper and this case is that the officers there had reason to believe that Harper posed a threat to them. He had fired a weapon once. They knew he had a weapon. One of the officers had seen the weapon in his hand in the tree. They knew he was under the influence of alcohol and methadone. They knew he had offered violence to his family. I think they had much greater reason to believe that he was a threat than Officer Benton ever did to believe that Mr. Robinson was a threat. In fact, Officer Benton admitted that Robinson never turned around. He never bladed his body. He never offered any sort of threat or violence to Officer Benton, and he was shot in the back. He was trying to get away without any probable cause of any crime. Yeah, so I think it just, and is it your position, and maybe, I mean, maybe it is, maybe this goes to the heart of this, is that, you know, there was, your position is that shooting someone off an eight-foot wall with a taser is lethal force because it is substantially likely for death or serious bodily injury to result of that, and that the same thing that happened in Harper too was lethal force too, but just that the facts of Harper too justified lethal force, or at least arguably. Or at least made it reasonable for the officers to think it was justified, whereas here those facts didn't exist. There was no probable cause for any offense, reasonable suspicion at most, based only on flight. Mr. Robinson wasn't even involved in the reasons for the traffic stop. I mean, it's not his car. It's not his tag, and so if there's just reasonable suspicion, you don't know that he's armed, which the officers did know in Harper. The only suspicion that he's armed is that someone had a gun, which the jury could find Mr. Sims disclosed and which is undisputed was lawfully his gun, and there are no charges were ever brought against Mr. Sims for that gun. It was his lawful weapon, his Second Amendment right to have it, but again, that's not Mr. Robinson. Mr. Robinson wasn't armed. He didn't have any drugs. He didn't commit any crime except arguably flight from the police, but even that under state law is not an offense because if the jury found that the traffic stop was unlawful to begin with, so there's just no criming, and to use what is deadly force on a man who the jury could find really did nothing wrong, even if he did one thing that was arguably suspicious. It's excessive. Any reasonable officer would know that no one should die from that. Okay, Mr. Moore, we've taken you over your time, but thank you very, very much. Thank you, Your Honor. Mr. Bryan, you've got your couple of minutes for rebuttal. Thank you, Your Honor. I would like to briefly start by mentioning that Mr. Moore's argument, again, I hear this over again, both in the briefs and now in argument, that if Officer Benton's initial reason for initiating the traffic stop was pretextual, then that would render any serious use of force almost per se unreasonable, and A, there's several problems with that. First is that the pretext analysis has no place in the Fourth Amendment context. We're talking about objective reasonableness here, and five officers testified that the temporary tag would have provided reasonable suspicion to start, but in any event, the reasonableness of the force is divorced from and separate from that in the first place. Unfortunately, the Supreme Court tied all of that together, and so as the first domino falls, so do the others, but getting back to Harper, because this is obviously an important point here, let's just say that Harper too came out the other way even. It's still an unpublished opinion that could not clearly establish law, but it came out in a way that establishes that qualified immunity is appropriate in those circumstances, and the circumstances of our case, of course, they're not perfect. Not every fact matches, but the material facts do match. Just like, I think Mr. Moore mentioned that one of the officers in Harper yelled out he has a rifle. Well, in our case, Officer Franklin said he might have a gun. He was, just like in Harper, the plaintiff was fleeing, was not complying with demands, could potentially pose a danger to himself or others. Let me ask you this question. I thought Mr. Moore had a good answer to my question, and he said that the fact that Benton knew that it was extremely dangerous to taser someone on the top of an eight-foot wall, therefore, he is different from the reasonable officer who, under Harper v. Davis, might not know that. Plaintiff argues that in this case, he testified that he did know that. Well, first, your honor, I think that, again, we look at this from an objective standard, that is, the standard of qualified immunity is a reasonable officer. So he gets off the hook even though he actually knew that? Well, I don't think that it is implausible to think that using a taser in a situation like Harper, too, would also cause serious injury, and it did, but the qualified immunity applied because we look at it from an objective standard, your honor. Thank you. Mr. Bryan, thank you very much. Mr. Moore, thank you very, very much. That constitutes the end of our session today.